IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

PARIS SCHOOL DISTRICT                                                           PLAINTIFF

v.                                              No. 2:15-CV-02197

A.H., by and through her parent
CYNDI HARTER                                                                    DEFENDANTS

## ORDER AND OPINION

Before the Court is Paris School District's (PSD) motion for summary judgment (Doc. 26),

brief in support of its motion (Doc. 27), and a statement of facts in support of its motion (Doc. 28).

PSD also submitted the administrative record on the docket.  (Docs. 29-40).  Defendants filed a

response in opposition to summary judgment (Doc. 41), a brief in support of their response (Doc.

42), and a statement of facts to which they contend there is a dispute of material fact (Doc. 43).

PSD filed a reply to Defendants' opposition (Doc. 44).  Defendants, as a party prevailing in part

at the state administrative level, made a demand for reasonable attorney's fees.  (Doc. 6, ¶¶ 87-

96).  As originally filed and up through all of the filings described above, this case had involved

PSD's lawsuit seeking reversal of the Hearing Officer's final order and opinion, as well as

counterclaims asserted by Defendants.  On July 13, 2016, the Court severed the non-IDEA claims

from this lawsuit.  (Doc. 45).  For the reasons set forth below, PSD's motion for summary judgment

(Doc. 26) on the claims in this case is GRANTED IN PART and DENIED IN PART.

I.      **Background**

On November 13, 2013, A.H. first enrolled in the PSD as a fourth grader.  (Doc. 6-1, p. 3).

While enrolled at PSD, A.H. received special education services for her diagnosis of autism.  (*Id*.).

A.H. previously attended school in Memphis, Tennessee.  Upon moving into the area covered by

1

the PSD A.H. was enrolled at the "virtual academy" of the Memphis school, and then a private school within the PSD. (*Id.*).

Upon enrolling A.H. at PSD, Ms. Harter provided the following to PSD: (1) a May 18, 2012 neuropsychological evaluation conducted at Memphis Neuropsychology, LLC that contained 16 specific recommendations; (2) a September 9, 2013 speech language evaluation conducted by Pediatrics Plus in Russellville, Arkansas; (3) a September 13, 2013 occupational therapy evaluation conducted at Pediatrics Plus, complete with four treatment goals and ten objectives that were considered appropriate treatment for A.H.'s deficits; (4) a September 19, 2013 physical therapy evaluation conducted by Pediatrics Plus that concluded that A.H. qualified for physical therapy to improve her participation in activities at home, in the community, and at school; (5) a November 6, 2013 letter from A.H.'s treating neurologist recommending that A.H. receive homebound services and that she be slowly integrated into a school setting at PSD; and (6) an assessment and behavior support plan developed by an independent consultant between October 2011 and August 2012 when A.H. was attending school in Memphis. (*Id.*, pp. 5-6). A team first convened on November 13, 2013 to develop an Individualized Education Program (IEP) for A.H. (Doc. 36, p. 30). In attendance were Ms. Harter, a special education teacher, a general education teacher, the director of special education, and two occupational therapists. (*Id.*). The IEP team decided to initially educate A.H. on a shortened school day in a regular classroom with special education services being provided in a resource room. (Doc. 6-1, pp. 6-7). The IEP provided for related services including occupational therapy, physical therapy, and speech therapy. (*Id.*, p. 7). PSD did not collect any evaluative data prior to developing the IEP, but presumably they were informed by the multiple assessments and opinions that Ms. Harter provided. (*Id.*).

The IEP team met again on December 13, 2014 to revise the IEP "to include a behavior management plan devised by the director of special education and to define the shortened school day that [A.H.] would attend." (*Id*.). The documentation shows that there were "other factors which needed consideration." (*Id*.). Allegedly, a behavior support plan was put in place at the December 13 meeting while the school worked to develop another one.[1] On December 20, 2013, PSD submitted a request for a behavior support specialist[2] to assist in the development of a behavior support plan. (*Id*., p. 8). The specialist then came to PSD to observe A.H. five times between January 30, 2014 and April 7, 2014. (*Id*.). After these observations, the specialist developed a behavior support plan which she provided to PSD on April 28, 2014. (*Id*.). That behavior plan addressed the issue of "noncompliance," but did not address any of the other behaviors reported by previous schools, reported by Ms. Harter, or those contained in evaluations. (*Id*.). The behavior plan generally lumped all of A.H.'s behaviors into the category "noncompliance." (*Id*., p. 9). This, and other facts in the record summarized below, show the lack of a baseline understanding of autism, which would have resulted in a more nuanced analysis. (*Id*.).

A.H.'s speech therapist testified that she provided services as outlined in A.H.'s IEP, although progress was not documented on the IEP. (*Id*., p. 13). A.H. received physical therapy in thirteen sessions from November 26, 2013 to March 17, 2014, although the therapists' notes do

---

[1] The existence of this behavior support plan is somewhat contested, and will be addressed below where appropriate. (Doc. 6-1, pp. 7-8).

[2] The record indicates that this specialist, Loretta Wallace, was supplied by the educational cooperative. (Doc. 35, p. 188). While neither party raises the issue, the Court notes that an employee of the educational cooperative is not an employee of any particular school district, but rather receives a salary from the ADE. (Doc. 29, p. 167). But the Hearing Officer treats the actions of Loretta Wallace as though they are actions of PSD. The Court does not pursue this issue further because the parties do not dispute this.

not reflect any progress towards the goals. (*Id*.). As per the IEP developed in November 2013, A.H. was supposed to be receiving 60 minutes of physical therapy per week. (Doc. 36, p. 4). On March 20, 2014, the physical therapist indicated that she received an email from PSD's special education coordinator, indicating that the IEP team had met and made the decision that physical therapy would be discontinued. (Doc. 6-1, p. 13). There was no evaluation done prior to discontinuing these services, and there was not a physical therapist present at the meeting where the decision was made to discontinue physical therapy. (*Id*.). The special education coordinator testified that the reason for this decision was that A.H. fought the physical therapist on "many occasions" and that "the physical therapist pretty much decided to end services because there was no progress." (*Id*., pp. 13-14). However the notes from the physical therapist recording summaries of the sessions held do not reflect this problem. (*Id*., p. 14). A.H.'s occupational therapist was present at the initial IEP meeting in November 2013, and was therefore part of the decision whereby A.H. was prescribed 60 minutes of occupational therapy in one session per week.[3] (Doc. 36, p. 4). The therapy notes indicate twenty-three occupational therapy treatment sessions between November 21, 2013 and May 23, 2014. (Doc. 6-1, p. 14).

The Hearing Officer reached the following conclusions about A.H.'s education at PSD during the 2013-2014 school year: the district failed to timely develop a behavior management plan, and when that plan was developed it was deficient because it identified A.H.'s behaviors only as "noncompliant;" A.H.'s teachers were not adequately trained; the occupational therapy and speech therapy were adequate; the physical therapy was deficient and was

---

[3] The Hearing Officer's opinion incorrectly states that at this IEP meeting, it was determined that A.H. would receive "two thirty-minute occupational therapy sessions twice weekly." (Doc. 6-1, p. 13). The Court instead relies on the documentation from the IEP meeting. (Doc. 36, p. 4).

discontinued without an appropriate evaluation; and A.H. was educated in the least restrictive environment. (*Id.*, pp. 14-15).

The IEP team convened on May 26, 2014 to evaluate A.H.'s performance during the fourth grade and develop an IEP for the upcoming fifth grade year. (*Id.*, p. 15). At that meeting it was determined that in the upcoming school year A.H. would receive 60 minutes of occupational therapy, 60 minutes of speech therapy, 700 minutes in the resource room, and the remainder of the time in the general education setting. (*Id.*). Another IEP team meeting was held on August 12, 2014, at which time the IEP team decided to place A.H. in the Alternative Learning Environment (ALE) instead of in the general fifth grade classroom setting. (*Id.*, p. 19). In attendance at this meeting were a counselor and co-therapist social worker, and they indicated that they were concerned about A.H. attending mainstream classes.[4] (*Id.*). Resulting from the treatment provided to A.H. by the Valley Behavioral group, individuals from that group changed her diagnosis to include "intermittent explosive disorder." (*Id.*, p. 18). Ms. Harter expressed that she thought this change in diagnosis was in part for insurance reasons, and she disagreed with the recommendations by the Valley Behavioral group. (*Id.*). There is some evidence that Ms. Harter opposed placing A.H. at ALE, but that is where the IEP team determined that A.H. would be placed. (*Id.*, p. 20). Based on this opposition, the Hearing Officer concluded that the placement agreed to during the May 2014 IEP meeting was the "last fully agreed to placement." (*Id.*).

A.H. began attending ALE for her fifth grade year. (*Id.*, p. 21). The ALE appears to have operated like a one-room-schoolhouse, with nine total students and one teacher. (*Id.*). Three of

_____

[4] The counselor and co-therapist social worker were associated with an entity identified in the record only as "Valley Behavioral group." Apparently, this group got involved in providing treatment to A.H. while she was part of a summer program, and Ms. Harter elected to continue working with this group. (Doc. 6-1, pp. 16-18).

the students, including A.H., were from the middle school and six of the students were from the high school. (*Id.*). There was one teacher, Coach Trey Prieur, who was not a "highly qualified" teacher in any of the core academic subject areas. (*Id.*). The ALE classroom did not meet any of the criteria of the Arkansas Department of Education (ADE) for educating A.H. (*Id.*). The ALE Director even acknowledged that criteria and requirements were not met, and that in effect ALE was not an appropriate placement for A.H. (*Id.*, p. 22). Furthermore, Coach Prieur and the ALE Director were not involved in the decision to place A.H. at ALE. (*Id.*, p. 21). PSD did not provide the occupational and speech therapy services provided for in the IEP, because PSD had not yet entered into a contract with a qualified provider. (*Id.*, p. 22). The Hearing Officer concluded that because of all of these breakdowns, PSD had failed to provide a Free Appropriate Public Education (FAPE) to A.H. during the 2014-2015 school year. (*Id.*, pp. 22-23).

Ms. Harter's relationship with PSD deteriorated, and she initiated a separate due process hearing to take up the issue of A.H.'s placement in ALE. (*Id.*, pp. 23-24). PSD argued that the last agreed placement was the placement in ALE. (*Id.*). Ms. Harter, however, thought that the last agreed placement was the one agreed to at the IEP meeting in May 2014, at which time it was agreed that A.H. would be placed in the regular school setting with supplemental special education services. (*Id.*, p. 24). PSD's superintendent claimed that in part because of Ms. Harter's demands that A.H. be moved out of ALE and in part because of an incident where A.H. allegedly made a death threat while in ALE, PSD was justified in terminating special education services. (*Id.*). However, there was "no testimony nor evidence presented that [A.H.'s] acting out behaviors were directed towards another student." (*Id.*). And the teacher who witnessed the alleged death threat testified that they did not take it as a viable threat. (*Id.*). The Hearing Officer concluded that "at this point [] it would have been [PSD's] responsibility of the [ADE's] regulations to ask for a due

process hearing to resolve the issue of whether or not [A.H.] needed special education services." (*Id*.).

## II.    Legal Standard

The IDEA requires every local educational agency ("LEA") receiving federal funds to implement policies "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agenc[y]." *B.S. ex rel. K.S. v. Anoka Hennepin Public Schools*, 799 F.3d 1217, 1219 (8th Cir. 2015) (quoting 20 U.S.C. § 1415(a)).   A party challenging whether an LEA provided FAPE has the right to file an administrative complaint and receive an impartial due process hearing before a local or state agency.  20 U.S.C. § 1415(b)(6).  The IDEA also allows for a party to seek a review of the local or state due-process hearing in federal district court.  20 U.S.C. § 1415(i)(2)(A) and (3)(A).  In reviewing a hearing officer's decision, the IDEA provides that the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415.

In handing such a review, a district court serves a quasi-appellate function while remaining a court of original jurisdiction.  *See Kirkpatrick v. Lenoir Cnty Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000) ("[W]hile a federal district court may review a state review officer's decision and even defer to that decision, the federal district court does not sit as an appellate court.  Federal district courts are courts of limited, original jurisdiction with no power to sit as appellate tribunals over state court or administrative proceedings."); *Spiegler v. D.C.*, 866 F.2d 461, 465-66 (D.C. Cir. 1989) (holding that the quasi-appellate role of the district court in an action brought under the [IDEA] does not differ in important ways from an administrative appeal for purposes of borrowing

an appropriate statute of limitations); *Adler by Adler v. Educ. Dep't of State of N.Y.*, 760 F.2d 454, 458-59 (2d Cir. 1985) (same). The Eighth Circuit has explained the nature of a district court's function in handling an IDEA claim as:

> The district court must . . . review the administrative record, hear additional evidence if requested, and "basing its decision on the preponderance of the evidence, . . . grant such relief as [it] determines is appropriate." *Id.* at § 1415(i)(2)(C). In deciding whether the IDEA has been violated, the district court must "independently determine whether the child [in question] has received a FAPE." *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003), *cert. denied*, 540 U.S. 984, 124 S. Ct. 478, 157 L. Ed. 2d 375 (2003). In doing so, the court must also give "'due weight' to agency decision-making." *Id.* (*quoting Independent Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)). This somewhat "unusual" standard of review is less deferential than the substantial evidence standard commonly applied in federal administrative law. *Dist. No. 283*, 88 F.3d at 561. But we have recognized that this limited grant of deference—"due weight"—is appropriate in IDEA cases because the ALJ "had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s]." *CJN*, 323 F.3d at 636 (internal quotation marks and citation omitted).

*K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011).

## III.    Discussion

In reviewing whether any of PSD's actions amounted to a violation of the IDEA, the Court must employ a two prong analysis as outlined by the Eighth Circuit. The first inquiry is whether the school complied with the procedures set forth in the IDEA. *K.E. ex rel. K.E,* 647 F.3d at 804. Second, the court must decide whether the resulting IEP was "reasonably calculated to enable the child to receive educational benefit." *Id.* (citations omitted). "If these requirements are met, the [school district] has complied with the obligations imposed by Congress and the courts can require no more." *Id.* At the time that the Hearing Officer wrote his final opinion, the Eighth Circuit law to be applied was the standard that a student who "enjoyed more than what [the court] would consider 'slight' or 'de minimis' academic progress" was not denied an educational benefit. *Id.*,

at 810. At that time, there was a notable circuit split.[5] The Hearing Officer cited to some law from circuits that required more than the Eighth Circuit, so to the extent that the Hearing Officer relied on the authority cited, the Hearing Officer committed legal error during his review.[6] Since that time, the United States Supreme Court rejected the "merely more than de minimis" standard that had previously been the law of the Eighth Circuit. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, No. 15-827, 2017 WL 1066260, 580 U.S. ___ (2017).

An IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." *Id*., at *4, *citing Honig v. Doe*, 484 U. S. 305, 311 (1988). Through the development and implementation of an IEP, the school provides a FAPE that is "tailored to the unique needs of a particular child." *Endrew F.*, 2017 WL 1066260, at *4. An IEP is "not a form document" and must be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id*., at *10. While there is no bright line rule defining what is required of a school, in *Endrew F.* the Court made it clear that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. (citations omitted). In defining what is "reasonably calculated" for a particular student, the Court acknowledged that this

---

[5] *See* Petition for Writ of Certiorari at 10-15, *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 136 S. Ct. 2405 (No. 15-827) (summarizing the circuit split and pleading for the Supreme Court to resolve it).

[6] For example, the Hearing Officer cited a case from the Third Circuit. *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3rd Cir. 1988). The only time that this case has been cited by the Eighth Circuit was by a dissenting Judge. *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 615 (8th Cir. 1997) (Gibson, J. concurring in part and dissenting in part). The Third Circuit was regarded as having adopted a much higher standard for IDEA compliance than the Eighth Circuit. *See* Cert. Petition, *supra* note 5. The Third Circuit standard was not adopted in *Endrew F*, and thus any reliance on it was error when written and still presents error today.

is a "fact-intensive exercise," and that it "will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id*. For most students, "a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." *Id.* at *11. But even where that is not feasible, an education still needs to be "appropriately ambitious in light of [the child's] circumstances." *Id*.

In comparing this standard to the "merely more than de minimis" test—previously the law of the Eighth Circuit—the Court held that "this standard is markedly more demanding." *Id*. Writing for a unanimous Court, Chief Justice Roberts stated that "[i]t cannot be the case that the [IDEA] typically aims for grade level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than de minimis progress for those who cannot." *Id*. Aiming "so low would be tantamount to sitting idly . . . awaiting the time when [students] were old enough to drop out." *Id*. at *12 (citations and quotations omitted). But this standard does not require an ideal education. *Id*. at *10. It "should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id*. at *12 (citations and quotations omitted). The Court will apply the standard articulated by *Endrew F.*, using the existing Eighth Circuit case law where it is still relevant.

**A.    PSD's Assignment of Error to what the Hearing Officer Found as Inadequate Training of Staff for the 2013-2014 School Year.**

PSD assigns error to the Hearing Officer's conclusion that the PSD staff who provided services to A.H. in the 2013-2014 school year "were not adequately trained nor were they prepared to address all of [A.H's] behavioral and social needs." (Doc. 27, pp. 13-14) (*quoting* Doc. 6-1, p. 15). To the extent set forth below, the Court agrees with PSD on this point, and reverses the finding of the Hearing Officer. In reaching this conclusion, the Hearing Officer relied on the

testimony of A.H.'s fourth grade teachers, which the Hearing Officer viewed as "indicat[ing] that they did not understand the noncompliance exhibited by [A.H.]." (Doc. 6-1, p. 9). The Hearing Officer similarly viewed the testimony of A.H.'s special education resource teacher. (*Id.*, pp. 9-10). The Hearing Officer also noted that the principal stated that he personally did not know a lot about autism. (*Id.*, p. 11). Further, the Hearing Officer found noteworthy that the school resource officer made the statement that he was "not a hundred percent sure exactly what autism is." (*Id.*, p. 11). Moreover, the Hearing Officer found that "[i]t would appear from their testimony that [A.H.'s] teachers and [PSD] authority figures interpreted 'noncompliance' as a purposeful and obstinate response by [A.H.] to demands or assignments." (*Id.*, p. 10).

PSD asserted that the staff were licensed professionals and that they provided services that allowed A.H. to make adequate academic progress during that year. (Doc. 27, p. 14). PSD argued that "[w]hether a child can 'achieve passing marks and advance from grade to grade' are both important factor[s] when determining whether a school district has developed an IEP that is 'reasonably calculated' to satisfy the IDEA substantive requirement." (*Id.*) (*citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 202 (1982)). This argument is not entirely responsive to the assigned error, however, because whether an IEP was reasonably calculated to satisfy the IDEA requirements answers a slightly different question than whether the PSD staff responsible for providing services to A.H. were adequately trained. In response to PSD's assignment of error and argument on this point, Defendants' only response is to quote one sentence from the Hearing Officer's conclusion. (Doc. 42, p. 8).

School districts must take reasonable steps to train and prepare a student's teaching staff. *Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223, 1230 (8th Cir. 1994). In *Light*, the training was adequate where the teachers were certified by the state and the school "provided special training

to members of the staff who regularly came into contact with [the student], including training in behavior management, inclusion, and crisis prevention and intervention." *Id*., at 1225.

The Hearing Officer's legal conclusion that PSD staff were inadequately trained for the 2013-2014 school year lacks support in the record, and the Court reverses that finding. The Hearing Officer relied on the way that PSD staff testified, stating in essence that because they did not understand autism, they must have been inadequately trained. The Hearing Officer did not state that the licensure or training fell below state standards. Rather, he determined that the knowledge that the teachers garnered from that training and licensure was below what he felt it should be. This imposes a higher standard on PSD than the Eighth Circuit imposed in *Light*. 41 F.3d at 1230. Furthermore, to rely on statements by the principal and the school resource officer[7] seems to go beyond *Light*, where the court was mainly concerned with the qualifications of the teachers. *Id*.

There is minimal proof that one teacher was licensed by the State of Arkansas (Doc. 30, p. 140), and despite taking the testimony of the fourth grade literacy teacher (Doc. 34, p. 7), the fourth grade math and science teacher (*id*., p. 85), and the elementary principal (Doc. 35, p. 183), the record was not developed to show insufficient licensure. There is some evidence that a teacher who had the most contact with A.H. received additional training, because Greta Strubel, the fourth grade special education teacher, had additional training on how to deal with behavior issues with special education students and specifically on autism. (Doc. 35, p. 143). The Court cannot say whether the remaining relevant PSD employees had additional training or not because counsel did not develop the record on this point. (Doc. 34, p. 7 (testimony of Lori Varnell, fourth grade literacy

---

[7] Additionally, it is unclear if the school resource officer was an employee of PSD, or rather was an employee of the Paris Police Department.

teacher)), (Doc. 34, p. 85 (testimony of Sharon Smith, fourth grade math and science teacher)), (Doc. 35, p. 183 (testimony of Alan Anderson, elementary principal)).  What little is on the record shows that PSD took reasonable steps in light of A.H.'s circumstances to train its teachers for the fourth grade year, and that is all that is required by the IDEA.  Therefore, the Court concludes that PSD's training of its teachers for the 2013-2014 school year did not violate the IDEA, and reverses the Hearing Officer's conclusion on this point.  Whether PSD's understanding of autism was so deficient that the IEP and behavior supports developed were inadequate is a separate issue that will be addressed below.  The Court also notes that this conclusion does not change the relief ordered by the Hearing Officer.  (Doc. 6-1, pp. 36-38).

   **B.**  **PSD's Assignment of Error to what the Hearing Officer Found as Inadequate Training of Staff for the 2014-2015 School Year.**

   PSD assigns error to the Hearing Officer's conclusion that PSD failed to "adequately train the instructional and non-instructional personnel who were assigned to teach and provide instruction to [A.H.]" for the 2014-2015 school year.  (Doc. 27, p. 14) (*quoting* Doc. 6-1, p. 22).  Unlike in the immediately preceding section, for the fifth grade school year there is convincing evidence that the training provided was deficient.  A.H. was educated in ALE, where the primary instructor was Coach Prieur.  When Coach Prieur was asked if he had ever received "information maybe through [a particular training] or otherwise, on whether or not [A.H.'s] behavior was or wasn't related to her autism" he responded "no."  (Doc. 31, p. 159).  When asked if he had an opinion on this issue, he replied "I don't."  (*Id.*).  When asked about whether he learned anything else about autism, he replied that he "got some notes on it."  (*Id.*).  Coach Prieur testified that he

was a certified Arkansas teacher, but that he was not a "highly qualified teacher."[8]  (Doc. 31, p. 154-55).

The extra training that PSD was to offer to its employees was written down as "[t]raining schedule for faculty and staff regarding [A.H.'s] needs on 10/4/14. Training to be provided by Western Arkansas Educational Service Cooperative."  (Doc. 36, p. 112).  However, when asked about this training the ALE Director stated that he had never heard about it.  (Doc. 31, p. 220). When Coach Prieur was asked about this training he indicated that they were introduced to a data sheet and additionally he stated, "we went over a Power Point and I don't remember what it was over."  (Doc. 31, p. 157).  When the Fifth Grade Special Education Teacher was asked about this training she reviewed the documentation and then responded "I really don't recall the training." (Doc. 32, p. 177).  Counsel followed up and asked, "do you recall whether you got it?" to which she responded "I don't recall."  (*Id.*).  The middle school principal stated that some additional training was conducted by Loretta Wallace, but that she did not attend so she could not confirm what was talked about.  (Doc. 33, p. 269).  PSD argued that all personnel were appropriately licensed and that "[Ms. Wallace] provided specific training on the behavior plan to [PSD] staff in early August 2014."  (Doc. 27, p. 15) (*quoting* Doc. 29, pp. 107-08).  While PSD has pointed to one place in the record where someone who did not even attend the training mentioned that it was carried out by Ms. Wallace, there is sufficient evidence in the record to support the Hearing

---

[8]  Although neither party clearly articulates what this means, the ADE has instituted Arkansas Qualified Teacher requirements which evolved from the previous Highly Qualified Teacher legislation.  *See Arkansas Qualified Teacher*, ARKANSAS DEP'T OF EDUC. (2014), http://www.arkansased.gov/divisions/human-resources-educator-effectiveness-and-licensure/educator-licensure-unit/arkansas-qualified-teacher.  This appears to have been a requirement for being a teacher educating A.H.  (Doc. 31, p. 154) ("And it states here, on personnel requirements, 4.03.2, 'All district instruction in core academic subject areas shall be provided by highly qualified teachers.')

Officer's conclusion that this training was inadequate, since not one staff member convincingly testified that it even happened.

This lack of training manifested itself in the indifference that some of the staff took towards handling A.H.'s disabilities seriously. For example, when asked about accommodations that he made for A.H. while she was in ALE, Coach Prieur stated "[a]nd I mean, I guess, you know, I'll get in trouble for saying this, but I just didn't think she needed some of these accommodations, because she was doing so well on her stuff and so I really didn't make a whole lot of accommodations for her." (Doc. 31, p. 162). Unlike in the preceding school year, the Court concludes that the record clearly shows that the teachers who had the most contact with A.H. did not receive additional training. And there were some licensure issues complying with the Highly Qualified Teacher requirements previously noted. This evidence shows that the training was deficient. *See* Section III.A above. The Court agrees with the Hearing Officer and concludes that the training for the 2014-2015 school year fell below that required by the IDEA.

### C. PSD's Assignment of Error to what the Hearing Officer Found as Untimely and Inadequate Behavior Plans for the 2013-2014 School Year.

PSD claims that the Hearing Officer's conclusions regarding A.H.'s behavior plans for the 2013-2014 school year are "clearly erroneous." (Doc. 27, p. 13). The Court disagrees with PSD on this point, and upholds the conclusion of the Hearing Officer. The Hearing Officer concluded that PSD committed error by "not appropriately addressing [A.H.'s] behavioral manifestations." (Doc. 6-1, p. 12). The Hearing Officer seems to base this conclusion on two findings. First, he found that PSD "failed to respond as quickly as possible to developing a behavior management plan specifically designed to meet the needs of [A.H.]." (*Id.*, pp. 14-15). Second, he found that the behavior plans were deficient because they addressed "noncompliant behavior," an umbrella conclusion that "did not sufficiently cover all [A.H.'s] behaviors manifested as a result of

experiencing Asperberger's disorder." (*Id*.).

The Hearing Officer found that the plans were not timely because they were "produced five months after entering the fourth grade." (*Id*., p. 15). PSD claims that this is an erroneous finding because "the record indicated that the first behavior plan was developed and implemented in November 2013, immediately after [A.H.'s] enrollment." (Doc. 27, p. 13). PSD then states that the plan "was modified in December 2013" and that "[a] more detailed behavior plan was developed in March and April 2014" by the behavioral consultant. (*Id*.). Defendants respond that A.H. was "not provided with any behavior supports until the April 28, 2014 IEP team meeting." (Doc. 42, p. 6). Defendants support their conclusion by asserting that any behavior plan implemented before April 28, 2014 was not attached to the IEP, was not introduced until the final day of the due process hearing, was not timely disclosed in litigation, and was not provided to them or to the Hearing Officer ahead of time. (*Id*.). Additionally they state that there "was no evidence that the plan was ever implemented." (*Id*.).

On the question of timely implementation, the issue is whether an earlier behavior plan was in existence before April 2014 and whether it was implemented before that time.[9] Having reviewed

---

[9] A predicate issue of practical concern to the Court is this: what document is PSD referring to as a behavior plan that existed from November 2013 to April 2014? In support of the assertion that such a document existed and was implemented, PSD offers the citations "PSD 031, 130" and "PSD 118; T.I 169-71." (Doc. 27, p. 13). The Court carefully reviewed the PSD exhibits labeled as "PSD 031," "PSD 130," and "PSD 118." (Doc. 39). Additionally the Court reviewed Volume I, pages 169, 170, and 171 of the transcript, the document that PSD is probably referencing with the citation to "T.I 169-71." (Doc. 29). While those documents offer an expert opinion and also offer support for the conclusion that PSD developed behavior plans in early 2014, they are not an indication that any such plan existed as of November 2013. Looking at Plaintiff's briefing on this point, in support of the proposition that a behavior plan existed but was not attached to the IEP, Plaintiff cited "Exhibit 11, p7-8." (Doc. 42, p. 6). The cited exhibit is a one-page email that has nothing to do with this issue. Since the Court is unable to make any sense out of these citations offered by parties, the Court will consider the pages with the labels "PSD 282" and "283" to be this missing behavior document. (Doc. 40, pp. 145-46).

the document that PSD claims was a behavior support plan in place in November 2013, the Court notices that it is a two-page typed document, with no dates or signatures. (Doc. 40, pp. 145-46). Additionally, it was not attached to the IEP and was not referenced by the IEP. The Hearing Officer's final decision and order acknowledges that this document exists, but confirms Plaintiff's arguments about procedural deficiency with this document. (Doc. 6-1, pp. 7-8). The Hearing Officer did not make any explicit findings about the legitimacy of this document or the weight given to it in reaching his conclusions. But now the Court must square the conclusion that a behavior plan was untimely because it was "produced five months after entering the fourth grade," (*Id.*, p. 15) with the existence of this document on the record. Either the Hearing Officer committed error, or he implicitly made a credibility determination that PSD's testimony on the last day of the hearing, claiming that this two-page, undated, typed document that is referenced nowhere in the other documents was not actually in existence when PSD said that it was. Given that the Hearing Officer made a point to highlight the procedural shortcomings of this document, it seems likely that he concluded the latter. However the Court finds it unnecessary to resolve this issue to reach a conclusion about PSD's assignment of error here, because the Hearing Officer's conclusion that PSD violated the IDEA by "not appropriately addressing [A.H.'s] behavioral manifestations" is not only about the lack of timeliness of the behavior support plans but also about their lack of substance. Regardless of whether the behavior plans were developed on time or five months later, they still violated the IDEA because of their substance.

The behavior plans developed for the 2013-2014 school year were deficient because they lumped all of A.H.'s behaviors into the category of "noncompliant behavior," completely ignoring the nuances of behaviors that manifest with autism. The Hearing Officer found this to be insufficient because "[t]he plan did not address any of the reported behaviors provided by the

17

previous schools, the Parent, or those contained in the evaluations." (Doc. 6-1, p. 8). Because of this deficiency the behavior plans did not inform A.H.'s teachers how to handle A.H.'s behaviors, which was apparent to the Hearing Officer from responses given by the teachers "that they did not understand the noncompliance." (*Id.*, p. 9). PSD was "advised with prior reports and information provided by the Parent that [A.H.'s] inappropriate behavior included much more that needed to be tackled and responded to." (*Id.*, pp. 10-11). Yet despite this knowledge, "[n]either the behavior support plan provided by [PSD's] special education supervisor as an interim plan, nor the consultant's plan developed in April 2014, contained any other behaviors to be addressed under [sic] than noncompliance with assignments and/or behavior." (*Id.*, p. 10).

"The IDEA does not mandate the inclusion in an IEP of a behavior plan…let alone behavioral improvements."[10] *Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 426 (8th Cir. 2010) (citation omitted). However, where a district court gives deference to the state's conclusion that the "materials attached to the IEPs did not constitute a proper behavior management plan" there is no error when this conclusion is adequately supported by the record. *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028 (8th Cir. 2003). The Hearing Officer's final opinion concluded that the behavior plans failed under the "merely more than de minimis" test for the reasons described above. The record sufficiently supports this conclusion, and shows that PSD's behavior plans were conclusory and failed to address A.H.'s misbehaviors. The Court agrees with the Hearing Officer's conclusion that the behavior plans were inadequate, especially in light of the higher standard of *Endrew F.* that must now be applied.

---

[10] *Endrew F.* does not necessarily change this Eighth Circuit precedent, although it might now be the case that, while the IDEA does not explicitly mandate a behavior plan, any given child's circumstances might implicitly require one. Whether or not the IDEA mandates a behavior plan, A.H.'s circumstances required that any IEP reasonably address behavior issues. The Court agrees with the Hearing Officer's conclusion that the behavior support plans in place were inadequate.

**D.    PSD's Assignment of Error to what the Hearing Officer Found as Inadequate Behavior Plans for the 2014-2015 School Year.**

PSD assigns error to the Hearing Officer's conclusions about the behavior support documents for the 2014-2015 school year (fifth grade).  As its only sentence offering argument in opposition to this finding, PSD stated that "[a]ppropriate behavior plans based on observation of [A.H.] and her medical providers' recommendations were developed and implemented at all relevant times."  (Doc. 27).  PSD made this conclusory statement without citation to the record.

At one IEP team meeting, the school discussed that it planned to press charges on A.H. because she had kicked someone in the chest.  (Doc. 32, p. 178).  PSD's intent to press charges is also clearly documented in the IEP team meeting notes.  (Doc. 36, p. 112).  The fifth grade special education teacher—who was at that meeting—was asked "[w]as there any discussion about what would happen if [A.H.] had another melt-down and another episode, like a Crisis Intervention Plan? Was that ever discussed at that meeting?" (Doc. 32, p. 177).  She responded "I don't recall that being discussed at that meeting."  (*Id.*).  The teacher was aware that the School Resource Officer had cited A.H. with nine separate violations of Arkansas Criminal Law.  (*Id.*, pp. 178-79).  When asked further, the teacher acknowledged that all of the future solutions that PSD discussed at that meeting were things that had already failed, thus resulting in PSD's decision to press charges.[11]

Additionally, there was no exit plan for A.H. to leave ALE, so it appears that PSD intended to send her to ALE indefinitely.  (Doc. 31, p. 203).  Sending a fifth grader indefinitely to an ALE

---

[11] It is clear that A.H. exhibited physically aggressive behavior and presented some level of risk to those around her, and the Court does not sit in direct review of PSD's decision to press charges against A.H.  However, considering that A.H. was a fifth grade student with special needs, the Court is skeptical that PSD was left with no other reasonable options than to rely on the criminal justice system.

program like this one could possibly be "sitting idly . . . awaiting the time when they were old enough to drop out." *Endrew F.*, 2017 WL 1066260, *12. The behavior plans for the 2014-2015 school year are inadequate and therefore deficient for the same reasons that the behavior plans from the previous year were deficient. *See* Section III.C.

> **E.    PSD's Assignment of Error to what the Hearing Officer Found as the Inadequate Provision of Physical Therapy.**

PSD assigns error to the Hearing Officer's conclusion that PSD's provision of physical therapy to A.H. was deficient. (Doc. 27, p. 14). PSD argues that the decision to terminate physical therapy services was one that was discussed in an IEP meeting and agreed to by Ms. Harter. (*Id.*). PSD further argues that the reason for terminating the physical therapy was that A.H. fought the physical therapist and that the therapy sessions were a trigger for behavior incidents. (*Id.*) (*citing* Doc. 29, p. 75 (testimony of LEA supervisor)). Defendants respond by stating that PSD made the decision to terminate physical therapy without the evaluation required by the IDEA. (Doc. 42, p. 7 (*citing* 20 U.S.C. § 1414(c)(5))). Defendants also argue that PSD's allegation that A.H. fought with the physical therapist is not supported by the record, and that to the contrary the physical therapist's notes indicate cooperation and compliance. (Doc. 42, p. 7 (*citing* Doc. 36, p. 257)). In its reply, PSD does not counter Defendants' argument that it should have conducted an exit evaluation, but it reiterates its arguments that the physical therapy services were a trigger for A.H. and that it got the approval of Ms. Harter before discontinuing the services, thus excusing the failure to comply with the original IEP. (Doc. 44, p. 6 (*citing* Doc. 39, p. 132)).

In essence, PSD does not argue that it did provide physical therapy in accordance with A.H.'s IEP, but rather argues that its noncompliance is excusable. If PSD were to succeed on this point the Court must make a factual determination of whether the physical therapy services were a trigger for A.H. since this might provide justification for PSD's actions. The notes of the physical

therapist from the therapy session on March 17, 2014 indicate compliance and progress. (Doc. 36, p. 257). PSD's argument to the contrary is supported only with a citation to the notes from the meeting held on March 19, 2014, that state that the services will be discontinued. (Doc. 39, p. 132). Those notes do not state a reason for that decision, and do not indicate any factual support for PSD's argument, any discussion of the issue, or any consent by Ms. Harter. (*Id.*). The testimony of the LEA supervisor attempted to shift the blame for the decision to discontinue physical therapy to the physical therapist, but that attempt is unsupported by the record. (Doc. 29, p. 75). PSD has failed to counter Defendants' arguments with citation to any evidence, and has not provided any basis for assigning error to this part of the Hearing Officer's final decision. The Hearing Officer concluded that A.H.'s "physical therapy needs … were not adequately provided and the discontinuance of such was without evaluative justification." (Doc. 6-1, p. 15). The Court agrees.

F.      **PSD's Assignments of Error to what the Hearing Officer Found as a Violation of the Stay-Put Provision and an Alleged Wrongful Determination of the Last Agreed Placement for A.H.**

PSD assigns error to the Hearing Officer's conclusions that PSD violated the stay-put provision and that the last agreed placement for A.H. was the regular class setting for the fifth grade year. (Doc. 27, pp. 15-16). PSD argues that because Ms. Harter revoked her consent at the time that she filed the due process challenge, and because it consulted with the ADE in making the decision to terminate special education services for A.H., it did not violate the IDEA. (*Id.*, p. 15). Defendants respond by pointing to numerous parts of the transcript where Defendant Fawcett spoke about A.H.'s placement, arguing that his words show a disregard for the procedures of the IDEA's stay-put provision. (Doc. 42, pp. 13-14). Defendants argue that the last agreed placement for A.H. during the pendency of the due process hearings was the one agreed to in May 2014, that

being the regular education setting, and that PSD refused to educate A.H. in that setting. (*Id.*, p. 13). Defendants then outline numerous ways in which she believes that PSD violated the IDEA with regard to violation of the stay-put provision. (*Id.*, pp. 15-16). In its reply, PSD argues that it did not fail to educate A.H. during the pendency of the due process hearing, but rather that Ms. Harter refused to bring A.H. to school. (Doc. 44, p. 3). PSD again asserts that Ms. Harter agreed to A.H.'s placement at ALE on August 12, 2014, so that was the last agreed placement. (*Id.*, p. 4).

The Court looks first to the statutory language of the stay-put provision. The IDEA requires that during the pendency of due process proceedings challenging the placement of a student, "the child shall remain in the then-current educational placement of the child." 20 U.S.C.A. § 1415(j). While protected under the stay-put provision, an IEP team or district cannot place a student in an ALE setting without the parent's consent. *Doe ex rel. Doe v. Todd Cty. Sch. Dist.*, 625 F.3d 459, 464 (8th Cir. 2010) (*citing M.M. v. Special Sch. Dist. No. 1,* 512 F.3d 455, 463 (8th Cir. 2008), *cert. denied,* 555 U.S. 979 (2008)). "The statute does not define the term 'then-current educational placement.'" *Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 833 (8th Cir. 2002). "The stay-put provision is literally and rigorously enforced, consistent with its purpose 'to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students.'" *Hale ex rel. Hale*, 280 F.3d at 833 (quoting *Honig v. Doe,* 484 U.S. 305, 323 (1988) (emphasis in original)).

With regard to determining A.H.'s stay-put placement, Defendants filed their due process challenge on October 2, 2014, and under the plain language of the statute, it appears that the ALE setting was the "then-current educational placement." The Hearing Officer found that the regular classroom setting was A.H.'s stay-put placement, however, since Defendants were pursuing due process proceedings to challenge the ALE placement. (Doc. 6-1, p. 20). The issue here is whether

the August 12, 2014 IEP meeting, at which Ms. Harter was in attendance, changed A.H.'s placement to ALE for purposes of the stay-put provision of the IDEA.  The Court concludes that the record supports the Hearing Officer's conclusion under two possible interpretations.

First, there is evidence on the record to support the Hearing Officer's conclusion that Ms. Harter was pursuing the due process hearing as an objection to the August 12, 2014 placement at ALE.  The documentation from the August 12, 2014 meeting clearly shows Ms. Harter's signature giving consent for A.H. to be educated at ALE.  (Doc. 36, pp. 98-101).  The only indication of Ms. Harter's objection to the August 12, 2014 ALE placement is her testimony that she felt like she was "pushed up against a wall" and that she was not prepared for the change that took place on that day.  (Doc. 34, pp 184-86).  Shortly after that meeting, on August 21, 2014, Ms. Harter began expressing her disagreement with the ALE placement.  (Doc. 37, p. 205).  And at a September 29, 2014 meeting, the notes from the IEP team show opposition to a placement at ALE.  And at the same time that she filed a due process challenge on October 2, 2014, Ms. Harter delivered a notice to the school that she intended to be the revocation of her consent for A.H. to be placed in ALE. (Doc. 34, p. 213).  In light of all of this evidence, even though at the time of the filing of the due process claim A.H.'s "then-current educational placement" was technically in ALE, there is sufficient evidence on the record to support the Hearing Officer's reading of the facts such that PSD should have placed A.H. in the regular education setting pending the outcome of Ms. Harter's challenge.

Even if the placement to be maintained under the stay-put provision was ALE, the Hearing Officer's implied findings support the conclusion that the August 12, 2014 meeting improperly changed A.H.'s placement to ALE such that the regular education setting should be the placement to be maintained.  When making a change in educational placement, a school cannot refuse to

Case 2:15-cv-02197-PKH     Document 48     Filed 04/03/17     Page 24 of 27 PageID #:
3770

consider a parents' concerns nor can it predetermine the educational program for a disabled student prior to meeting with the parents, because the core of the IDEA is "the cooperative process that it establishes between parents and schools."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005).  The documentation from that meeting shows no notice was given to Ms. Harter that a placement change had been initiated, and the Hearing Officer found it significant that PSD inappropriately relied on the outside counseling agency.  (Doc. 6-1, pp. 25-26).  This meeting appears to have been organized hastily without thorough review of data and without the participation of key people in A.H.'s education.  (Doc. 33, pp. 105-07).  Going into the August 12 meeting, Ms. Harter "stated that she knew nothing about [ALE]."  (Doc. 6-1, p. 19).  Further, the Hearing Officer impliedly made a credibility determination in believing the testimony of Ms. Harter over that of PSD.  (Doc. 6-1, p. 20).

This is enough for the Court to find that the cooperative process was compromised.  The Court defers to the Hearing Officer's credibility determination to believe Ms. Harter, and finds that there is sufficient evidence in the record to find that the decision on August 12, 2014 to place A.H. in ALE was problematic predetermination.  Therefore, even if the Hearing Officer was incorrect above about the placement determination under the stay-put provision, the error was harmless given that the Hearing Officer also made the implied finding that the placement at ALE was problematic predetermination in the first place.  As a result, the placement to be maintained during the pendency of the due process hearing was that agreed to in May 2014.

Regarding PSD's argument that it did not have to provide special education to A.H. during the pendency of the due process hearings either because Ms. Harter revoked consent or because Ms. Harter was the one who prevented the education by refusing to bring A.H. to school, the Court agrees with the Hearing Officer's conclusions.  PSD's attempts to argue that Ms. Harter's

revocation of consent exonerated it of responsibility ignore the Hearing Officer's conclusion that it was PSD's responsibility to ask for a due process hearing to resolve the issue of whether or not A.H. needed education services.  (Doc. 6-1, p. 24).  The letter that PSD cites as evidence of its good faith is actually a letter written after the Hearing Officer entered his final order.  (Doc. 44-1).  The evidence further indicated that PSD called the ADE and spoke with a law student who worked there to get advice.  (Doc. 35, pp. 194-96).  PSD's briefing on this point is light on citations to authoritative case law or supporting evidence.  The Hearing Officer thoroughly reviewed the evidence on this point, rejected PSD's asserted reason that it did not have to educate A.H. because she presented a danger, and concluded that even if Ms. Harter was not bringing A.H. to school, she still "remained the educational responsibility of the District."  (Doc. 6-1, p. 24).  Therefore, the Court finds no error with the Hearing Officer's conclusions that PSD violated the stay-put provision of the IDEA and that the placement to be maintained for purposes of this provision was A.H.'s placement in the regular education setting agreed to in May 2014.

### G.    Plaintiff's Request for Attorney's Fees.

"A prevailing party at the administrative level is entitled to an award of its attorneys' fees." *Swearingen v. Ozark Mountain Sch. Dist.*, No. 3:16-CV-03029, 2016 WL 7155773, at *6 (W.D. Ark. Dec. 7, 2016).  A party has prevailed "if it succeeded on any significant issue which achieved some of the benefit it sought."  *Yankton School District v. Schramm*, 93 F.3d 1369, 1377 (8th Cir. 1996).  "The IDEA's attorney's fees provision, 20 U.S.C. § 1415(e)(4)(B) (1986), is similar to the civil rights attorney's fees award statute, 42 U.S.C. § 1988 (1986).  Under both statutes, attorney's fees should ordinarily be awarded to the prevailing party unless 'special circumstances' exist to make an award unjust." *Borengasser v. Ark. State Bd. of Educ.*, 996 F.2d 196, 199 (8th Cir. 1993).

25

The Court finds that Defendants prevailed in the state administrative proceedings, and they are entitled to reasonable attorney's fees under the IDEA.  Defendants made many claims for relief.  The Hearing Officer ordered the following relief: (1) the immediate development of a temporary IEP for A.H. to be educated in the regular classroom setting including the initiation of comprehensive evaluations, (2) that the evaluations be conducted by professionals agreed to by PSD and the parent, (3) that the evaluations be completed by the deadline given, (4) that PSD assemble an appropriate IEP team to develop an IEP and appropriate behavior support plans, (5) compensatory education services, and (6) that PSD employ the services of a qualified behavioral consultant.  (Doc. 6-1, pp. 37-38).  Defendants successfully challenged several aspects of A.H.'s education and put PSD on notice of a number of problems with regard to its compliance with the IDEA.  The fact that Ms. Harter declined to send A.H. to PSD is not dispositive.  *Swearingen*, 2016 WL 7155773, at *9.

The Court will refrain from making a specific award of fees at this time.  Defendants are directed to submit briefing on the amount of fees requested.  PSD will have an opportunity to respond to the reasonableness of Defendants' request and object appropriately.  The Court will then address the amount of fees to be awarded in litigating this IDEA action.  Although the other non-IDEA claims have been severed from this case, they arise from the same facts, and legal work done in this case is likely duplicative of work done on the non-IDEA claims.  To the extent that additional fees may be appropriate after the resolution of the non-IDEA claims in the related case, those fees will be offset by the work done and the fees awarded in this case to the extent appropriate.

IV.    **Conclusion**

IT IS THEREFORE ORDERED that the Paris School District's motion for summary judgment (Doc. 26) is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED insofar as the Court finds that PSD's training of its teachers for the 2013-2014 school year was compliant with the IDEA, and the Hearing Officer's conclusion to the contrary was reached in error. The Motion is DENIED insofar as the Court finds that the Hearing Officer reached the correct conclusion on Defendants' IDEA claim in all other aspects.

IT IS FURTHER ORDERED that Defendants' request for reasonable attorney's fees (Doc. 6) is GRANTED. The Court declines to award a specific amount of fees, but directs the parties to submit briefing as to the amount to be awarded for work done on the IDEA claim. Defendants shall submit their briefing on costs and fees in fourteen (14) days. Plaintiff will have seven (7) days to respond.

IT IS FURTHER ORDERED that the Hearing Officer correctly determined that the Paris School District denied A.H. a Free Appropriate Public Education and that Defendants are entitled to the remedies set forth in the Hearing Officer's decision and order.

Judgment will be entered accordingly.

IT IS SO ORDERED this 3rd day of April, 2017.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE